### IN THE UNITED STATES DISTRICT COURT
### MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **JEFFREY BRAZIL** | : | |
| **Plaintiff,** | : | **Civil Action No.:** |
| | : | |
| **vs.** | : | |
| | : | |
| | : | |
| **SCRANTON SCHOOL BOARD a/k/a** | : | |
| **Board of Directors** | : | |
| | : | |
| **and** | : | |
| | : | |
| **TROOPER MICHAEL MULVEY** | : | |
| **in his official and individual capacity** | : | |
| | : | |
| **And** | : | |
| | : | |
| **SPECIAL AGENT ROBERT MCHUGH** | : | |
| **In his official and individual capacity** | : | |
| | : | **JURY TRIAL DEMANDED** |
| **And** | : | |
| | : | |
| **MELISSA MCTIERNAN** | : | |
| **In her official and individual capacity** | : | |
| | : | |
| **And** | : | |
| | : | |
| **PAUL DOUGHERTY** | : | |
| **In his official and individual capacity** | : | |
| | : | |
| **Defendants** | : | |

## COMPLAINT

## I.  INTRODUCTION

1.      This action for declaratory, injunctive and other appropriate relief is brought by Plaintiff Jeffrey Brazil to redress the above-named Defendants' intentional violations of the rights secured to him by the laws of the United States of America.  Defendants' willfully and

maliciously made false statements to various law enforcement and investigatory bodies directly leading to Plaintiff's arrest and the institution of specious criminal charges on September 30, 2020.  But for Defendants lies and intentional omissions of exculpatory fact, Plaintiff, the former director of operations for the Scranton School District, would not have been unprecedently charged with endangering children for allegedly failing to address lead and asbestos in several school buildings, some of which were constructed over one hundred years prior[1].  Defendants falsely arrested and maliciously prosecuted Plaintiff despite knowing that Plaintiff voluntarily and proactively conducted lead and asbestos testing, ***made the results known*** and ***instructed maintenance staff to take problematic water fountains and sinks out of service***.[2] Defendants conspired to coax a grand jury to recommend charges against plaintiff for political reasons and to conceal their own failings.  All charges were eventually dismissed as unethical with an express apology from Defendant Mulvey.

## II. JURISDICTION

2.      Jurisdiction is conferred upon this court by the Fourth, Fifth and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983 which provide original jurisdiction for Plaintiff's claims.

3.      Jurisdiction over the state law claims is based on the principles of supplemental jurisdiction, as codified at 28 U.S.C. § 1367.

4.      The amount in controversy exceeds one hundred and fifty thousand dollars ($150,000).

---

[1] Despite Defendants' rhetoric, it is undisputed that no child was harmed because of lead or asbestos exposure
[2] All ***air quality*** reports from 2016 through Plaintiff's resignation are negative; that is to say, Defendants ***never*** had any evidence that children were endangered from asbestos.

## III. VENUE

5.      All actions complained of herein have taken place within the jurisdiction of the United States District Court for the Middle District of Pennsylvania and involve Defendants who reside within the jurisdictional limits. Venue is accordingly invoked pursuant to the dictates of 28 U.S.C. § 1391(b) and (c).

## IV. PARTIES

6.      Plaintiff, Jeffrey Brazil, resides within the county limits of Lackawanna County, Pennsylvania.

7.      Defendant, Scranton School Board, is a municipal entity located at 425 N. Washington Ave., Scranton, PA 18503.

8.      Defendant, Trooper Michael Mulvey, is a Pennsylvania State Trooper assigned to Troop R located 85 Keystone Industrial Park Rd, Dunmore, PA 18512.

9.      Defendant, Special Agent Robert McHugh is an investigator with the Pennsylvania Attorney General's office with the offices located at 16th Floor, Strawberry Sq., Harrisburg, Pa 17120.

10.     Defendant, Superintendent, Melissa McTiernan, is a Scranton School District official located at 425 N. Washington Ave., Scranton, PA 18503.

11.     Defendant, Paul Dougherty, is a former Scranton School District official located at 425 N. Washington Ave., Scranton, PA 18503.

12.     Defendants above named were at all times acting under color of state law.

## V.     FACTS

**A.     Jeffrey Brazil Has A Special Relationship To The Scranton Area And Its Residents; He Would Never Intentionally Harm His Community**

13.     Plaintiff was born and raised in Scranton, Pennsylvania.

14.     Plaintiff is the youngest of 8 children, all of whom attended and completed their education within the Scranton School District (SSD).

15.     Plaintiff's several nieces and nephews attended school in the SSD at the relevant time.

16.     Plaintiff graduated from Scranton Central High School and then attended Wilkes University in Wilkes-Barre, PA where he obtained a Bachelor of Science in business administration.  Plaintiff began his master's program in public administration at Marywood University in Scranton.

17.     Plaintiff was a well-known and highly visible member of the Scranton Community.  Plaintiff was president of the non-profit club, German American Federation of Lackawanna County-Waldorf Park for 23 years.  He was reelected every year due to his dedication to the park and surrounding community, which included myriad fund raisers benefiting youth programs and underserved families.

18.     Plaintiff has three children that he raised in Scranton.

19.     From July of 2007 through January of 2012 Plaintiff was the director of Public Works – Deputy Mayor for the City of Scranton.

20.     While employed with the City of Scranton Plaintiff volunteered to build playgrounds for the same children that Defendants accused Plaintiff of intentionally trying to poison.

21.     Prior to working for the City of Scranton Plaintiff was a member of the Laborers Local 130 labor union from 1994 to 2003, working to build and improve the Scranton area.

22.     All of the above-named Defendants were aware of Plaintiff's civil service, years of dedication to his community and personal ties to Scranton**.**

**B.     Plaintiff accepts position as Director of Facilities and Grounds for The Scranton School District**

23.     In January of 2012, Plaintiff accepted a job offer to become the Director of Facilities and Grounds for the Scranton School District.

24.     In this roll, Plaintiff was tasked with supervising over 100 maintenance staff who were in turn responsible for maintaining 19 school buildings.

25.     Plaintiff's physical office was located at 425 North Washington Ave, in Scranton, PA where he reported to his administrative job for eight hours a day.  Plaintiff was not required to, nor could he, be physically present at the sixteen school buildings in his regular course of business; Defendants were aware of this limitation.

26.     By extension, it was impossible for Plaintiff to physically inspect every school building in order for him to have firsthand knowledge of day to day activities.

27.     Most of the subject school buildings were fifty or more years old when Plaintiff inherited their care; all public service employees in Scranton, including Defendants, were necessarily aware that virtually every building had some form of asbestos and lead piping.

28.     According to Defendants, it was Plaintiff's job to "ensure safe and healthy *buildings* that provide quality educational environments."

29.     It is undisputed that Plaintiff's job duties did *not* include control or supervision of students.

**C.    In 2016, Plaintiff Voluntarily and Proactively Tests Scranton Schools For Environmental Hazards; Defendants Use Plaintiff's Voluntary Act as a Means To Maliciously Prosecute and Falsely Arrest Plaintiff**

30.    In 2016, Plaintiff retained environmental testing company, Guzek & Associates, (Guzek) to test the air quality at the 16 SSD schools at issue; in so doing, upon information and belief, **Plaintiff became the first SSD employee, *ever*, to test SSD's air quality** to ensure that known encapsulated asbestos had not become hazardous and breathable[3]

31.    In the same year, upon and information and belief, Plaintiff became *the first SSD employee, ever, to test SSD's drinking water* to determine whether there were unsafe lead levels.

32.    Plaintiff voluntarily and proactively initiated the above testing in 2016; this is undisputed.  If Plaintiff wished to conceal a known dangerous condition in the SSD he would have done the opposite.  Defendants were at all relevant times aware of the foregoing.

32.    As SSD operations manager, Plaintiff was required to submit all costs/invoices incurred in the performance of his job to the SSD business manager and superintendent; the costs/invoices/bills were then compiled and provided to all Scranton School Board Members for approval each month.  Defendants were at all times aware of the foregoing.

33.    Plaintiff submitted costs/invoices from Guzek's 2016 testing with related explanation were provided to all Scranton School Board Members and approved.  This is undisputed.

**D.    2016 Air Quality Test Results Are *Negative* For Harmful Airborne Asbestos Particles**

34.    It is undisputed that the air quality test performed by Guzek that Plaintiff proactively procured in 2016 demonstrated zero risk to students from breathing the air at the

---

[3] Intact and properly maintained asbestos containing materials (ACM) do not create an unsafe condition unless disturbed and released. ACMs are generally not considered to be a health risk when the fibers are normally bound or contained in the building material itself

sixteen SSD school buildings at issue.  Stated another way, the 2016 air quality reports stated that there was no health risk associated with breathing air in any school.

35.     Plaintiff maintained and preserved the 2016 test results, which were readily available for anyone to review at any time, including Defendants.

36.     ***Defendants at all relevant times were aware of the 2016 results***.

37.     Importantly, Guzek did ***not*** recommend closing ***any*** SSD school nor did he recommend that students not attend school.  In contrast, Guzek ***did*** previously recommended school closures for mold issues.  Defendants were always aware of these facts.

38.     Plaintiff retained Guzek because testing asbestos and understanding the health hazards, if any, associated with asbestos requires expert knowledge.  This is undisputed.

39.      Plaintiff went even further and contracted Guzek and associates to provide mandatory 2-hour asbestos awareness training to all maintenance employees.  Plaintiff forwarded related costs incurred to the SSD business manager and superintendent; the costs/invoices/bills were then compiled and provided to all Scranton School Board Members for approval. Defendants were at all times aware of the foregoing.

40.     Despite all air quality tests revealing no hazard, Plaintiff went further still and requested contractor bids in April of 2016 to abate and remove asbestos at the West Scranton Highschool.  This is a matter of record and undisputed.

41.     Plaintiff continued to monitor the asbestos situation and inform his superiors of the any developments. By way of example, on January 30, 2018, Plaintiff emailed superintendent, Alexis T. Kirijan, the following[4]:

---

[4] Upon his resignation, plaintiff lost the ability to access the SSD server and therefore was unable to download the abundance of electronic communications and documents that clearly

"I just wanted to update you on the progress at Willard elementary school. The tests were sent out yesterday and the lab responded today that we need to submit them again. Chris from Guzek feels that the brick dust, from our maintenance crew jack hammering, caused this contamination. The removal of the wall was necessary in order to repair the broken steam line. New air samples were taken this afternoon and overnighted to the Lab, with results expected back tomorrow afternoon. I would like to make one thing clear, these are air samples for the asbestos removal project, not air quality tests. These tests are required by the OSHA guidelines. In addition I have instructed Guzek associates to conduct air quality testing in the building and they recommended doing them next week. I will notify you and the building principal on which day this will transpire. Should you have any questions please feel free to call me.
Thanks
Jeff Brazil"

**E.      2016 Water Test Results Indicate Some Water Fountains and Sinks Have Elevated Lead levels; Plaintiff Immediately Directs Maintenance Staff To Take The Subject Fountains and Sinks "Out of Service," and To Place Glen Summit Spring Water Dispensers At Each affected Location**

42.     In 2016, the Commonwealth of Pennsylvania did not require school officials to test water for lead.

43.     Despite having *no duty* to test for lead, Plaintiff proactively hired Guzek to test for lead in the SSD water due to the discovery of lead in Flynt, Michigan's drinking water.

44.     On June 8, 2016, Joseph Guzek stated to the local newspaper that "The vast majority of samples ***showed no detection of lead***, but anything that approached the EPA action level of 50 parts per billion ***was addressed***". ***The results do not mean that there was a health hazard***, but action would eventually be needed.  Defendants were at all relevant times aware of Guzek's expert statements.

_____

demonstrate he in no way attempted to conceal a known dangerous condition at SSD schools; quite the opposite – Plaintiff conducted his job duties in diligent and conscientious manner.

45.     In response to Guzek's lead test, Plaintiff alerted all relevant SSD staff to the results and directed the daytime maintenance supervisor, Joseph Slack, to "unplug/disconnect and bag" water sources with elevated lead levels.

46.     Joseph Slack told Defendant investigators prior to Plaintiff's arrest that Plaintiff in fact emailed him and Kirijan test results and directed him to close fountains and turn off water sources. ***Mr. Slack will further testify that Defendants pressured him to state otherwise in order manufacture a case against Plaintiff, but that Slack refused***.

47.     Similarly, LuAnn Henehan, the president of the maintenance union, will testify that Plaintiff instructed her and other maintenance staff to turn off sinks and "bag" water fountains.

48.     Plaintiff took the additional step of notifying principals of affected schools of the reason certain water sources were being "bagged and turned off;" by way of example, Plaintiff personally "texted" principal Al O'Donnell in June of 2016 with a copy of Guzek water test results.  See Exhibit "A."

49.     Plaintiff then purchased large pallets of water from Sam's Club and directed staff, Paula Girodano, to order additional coolers from Glen Summit Spring Water company.  Plaintiff placed water coolers directly in front of unplugged and bagged water fountains which accomplished two objectives:  precluding children from reaching the disconnected water sources and providing fresh drinking water.

50.     Paula Giordano, the facilities secretary at the relevant time, will testify that she ordered water and water fountains from Glen Summit and will also confirm that Plaintiff bought and distributed water to all affected schools. She will further confirm that the superintendent was aware of the situation.

51.     ***The above remedial acts were conspicuous, obvious and known to Defendants.***

***The above remedial acts are a matter of record and cannot be disputed.***

**F.      On July 1, 2018, Pennsylvania Amends The Public School Code Making Lead Testing Mandatory**

52.     On July 1, 2018, Pennsylvania enacted 24 P.S. § 7-742 which states,

(a) Beginning in the 2018-2019 School year, and every school year thereafter, school facilities where children attend school may be tested for lead levels in the drinking water and any school facility whose testing shows lead levels in excess of the maximum contaminant level goal or milligrams per liter as set by the United States Environmental Protection Agency's National Primary Drinking Water Regulations shall immediately implement a plan to ensure no child or adult is exposed to lead contamination drinking water and that alternative sources of drinking water are made available.

(b) If a school entity does not test lead levels under paragraph (a) the school entity shall, at a public meeting, discuss lead issues in the school facilities.

(c) If a test of lead levels under subsection (a) is elevated, the level shall be reported to the Department of Education and posted on the department's publicly accessible Internet website.

53.     Importantly, 24 P.S. § 7-742 ("Lead Testing Code") is not penal in nature; it does not provide for any criminal penalty whatsoever if someone or some entity fails to properly follow the rule.

54.     Further, the Lead Testing Code does not even require testing; instead, it requires testing ***or*** a meeting to "discuss lead issues in school facilities."

55.     It must also be noted that the Lead Testing Code does not specify the way a school should ensure that children are not exposed to lead and, most importantly, ***it does not require a school to be closed where lead is present***.

56.     As a result of the changed law, Plaintiff again retained Guzek and Associates in the late fall, early winter of 2018 to conduct lead testing; testing was to be done over winter break.  This is a matter of record and undisputed.

57.     Plaintiff forwarded the results of this testing "up and down" the SSD administration.  This is a matter of record and cannot reasonably be disputed.

58.     Despite the above, Defendants knowingly and wrongfully alleged that Plaintiff's failed to adhere to the Lead Testing Code the used Plaintiff's alleged failure as proof that Plaintiff intended to endanger children.

**G.     In Early November 2018 Plaintiff Falls Down Granite Steps While Carrying Boxes At Work; He Is Taken By Ambulance To A Hospital And Remains Out Of Work For Several Months**

59.     On or about November 1, 2018, Plaintiff was walking down granite steps at work when he suffered a dangerous fall resulting in severe injuries, including a concussion.  Plaintiff's fall was conspicuous and a matter of record – he was taken by ambulance to a local hospital, he used his official sick and vacation time while he was unable to work, and the SSD paid his medical bills.

60.     Plaintiff remained out of work until the beginning of February 2019.

**H.     Defendants McTiernan And Dougherty Were Aware Of All Guzek Test Results Prior To January Of 2020 But Falsely Alleged That They Had No Knowledge Of Dangerous Lead Or Asbestos In Order Support The Criminal Case Against Plaintiff And Shift Blame Away From Themselves**

61.     On or about March 15, 2019, Plaintiff tendered his resignation.  Plaintiff was unhappy with his working conditions and accepted an opportunity to work elsewhere.

62.     The superintendent during the relevant time period, Alexis Kirijan, resigned on August 15, 2019.

63.     Plaintiff and Kirijan were replaced by Defendants Dougherty and McTiernan, respectively, on or before August 15, 2019.

64.    Both Dougherty and McTiernan had previously been employed by the SSD for over 20 years in various administrative capacities and were aware of asbestos and lead testing, water shut-offs and the purchase of Glen Summit water coolers.  By way of example, McTiernan was an administrator – her office was next to Plaintiff's, and she was aware of Plaintiff's water and air testing and the results of same.  She was also the former principal of South Scranton Intermediate Middle School, one of the schools for which Plaintiff directed Joseph Slack to turn water off.  In fact, South Scranton Intermediate Middle School served as the warehouse in which Plaintiff stored all of the Glen Summit Spring water that he distributed to schools to protect children from drinking any water having lead.  McTieran was obviously aware of this.

65.    On August 22, 2019, Dr. Candis Finan sent an email to the school board (The Finan Email), including Defendants, Dougherty and McTiernan, stating:

Remainder of page intentionally left blank – see image/email below

Hello Board Members,

With less than one week left before classes begin at SSD, I would like to provide you with additional updates of issues.

The West Scranton Intermediate School window replacement is a continuing saga. We have informed Mesko that the district will not incur any overtime costs due to issues that they have had supplying the windows. They will have to complete the project with paying for the overtime Air quality from Northeast is real good. No asbestos is reported. The room in the basement will still need to be remediated due to asbestos. Jeff is getting quotes for the work. All work will be completed at night under controlled conditions.

Bill Byron sent an e-mail with his opinion the the Northeast entryways on Gibson Street are unsafe. We will work on getting an assessment of the structural needs for the entryways. Students will not be using these entryways. Additional information will be forthcoming.

Paul will provide an update on the facilities at the meeting on Monday night. Included in the update will be the drainage issue at Willard and the sprinkler assessment and water heater at Scranton High and the Armstrong school.

Rocco DiPietro from Cocciardi and Associates, Inc. has issued a statement that the air quality at Armstrong is fine and that the mold is no longer an issue. There is an issue with our HVAC system in the building. The humidity is improving with the chillers in the HVAC systems turned off and the carpets having been removed. With One Point and some members of our staff working over the weekend Armstrong will be ready for the students on Wednesday. For the remaining classrooms and office area the quotes for the tile and installation from One Point was at (installation) and below (tile) state contract pricing for a total of $53,000. If everything does go as planned and the building is ready for students on Wednesday, it is a tribute to a number of employees who made the possible--a true Scranton Team effort!

We believe that we have a plan for the Latin schedule and for the German classes. We are awaiting acceptance from the German teacher. The only positions left to fill are long term substitute positions.

Staffing is now down to 5 long term substitute positions.

Transportation routing is still in process. An update will be provided at Monday night's meeting.

I will also have a legal update regarding an opinion received today.

Thank you for your time.
Dr. Candis M. Finan

66.     The individual referred to only as "Jeff" in the email is "Jeff Kelly," acting facilities manager for SSD.

67.     The following week after the above email was sent, Defendants Dougherty and McTiernan sent students back to all SSD schools without exception having in their possession the same air quality and water tests for which Defendants later criminally prosecuted Plaintiff. *Of particular note is the statement "air quality test from Northeast [high school] is real good."*

68.     Jeff Kelly will confirm that Defendants Dougherty and McTiernan were aware of asbestos and lead reports 6 months before they publicly denied having this knowledge. Mr. Kelly will further confirm that he had conversations with Dougherty about reports and actually handed them to him but that Dougherty dismissed the reports and instructed Kelly to not worry about them.

**I.     Plaintiff Is Arrested On September 30, 2020 As A Direct Result Of Defendants Above Named Intentionally False And Misleading Statements And Other Fabricated Evidence Set Forth in Criminal Complaint and Presented To A Grand Jury On September 18, 2020.**

69.     A grand jury was conducted on September 18, 2020.

70.     Defendants above named proffered false and misleading statements and other fabricated evidence at the grand jury and in a criminal complaint to arrest and charge Plaintiff with child endangerment and 18 Pa. C.S.A. § 2705 "recklessly endangering another person," and 18 Pa. C.S.A. § 4304(a)(1) "Endangering the Welfare of Children."

71.     Defendants intentionally false and misleading statements in Grand Jury proceedings and in Plaintiff's criminal complaint include following:

     a.     "Plaintiff misled the public at a press conference on June 8, 2016 falsely alleging that the problem [water contamination] had been completely solved."  This is a lie. As set forth above, *Joseph Guzek* stated at the subject press conference that "The vast majority of samples *showed no detection of lead*, but anything that approached the EPA

14

action level of 50 parts per billion *was addressed*, Mr. Guzek said. ***The results do not mean that there was a health hazard,*** but action would eventually be needed. Defendants were at all relevant times aware of Guzek's expert statements.

      b.     "There is no safe level of lead in drinking water." This is a lie. The Commonwealth of Pennsylvania defines unsafe levels of lead in water as water that "shows lead levels in excess of the maximum contaminant level goal or milligrams per liter as set by the United States Environmental Protection Agency's National Primary Drinking Water Regulations.

      c.     "only after superintendent Kirigan finally resigned were the problems addressed.  When the new administration was advised of the situation, the dangerous water sources were immediately disconnected, and asbestos-affected school district buildings had to be closed until remediation could be undertaken." As set forth in detail above, this is a lie and easily proven false.

      d.     "On January 6, 2020, Melissa McTiernan and Paul Dougherty stated that neither they, nor anyone to their knowledge currently in the SSD, were ever made aware of high levels of lead in drinking water." As set forth in detail above, this is a lie and easily proven false.

      e.     "While 2018 water test results **WERE FORWARDED [BY PLAINTFF] TO THE PRIOR SSD ADMININSTRATION IE, KIRIJAN'S ADMINISTRATION, WATER FACILITIES WERE NOT DISCONNECTED AND NO WARNING SIGNS WERE WRE PLACED ON THEM."** This statement is intentionally misleading and intentionally omits exculpatory facts relevant to Plaintiff.  Plaintiff was on medical leave when the water results were received.  He dutifully alerted Joseph Slack and the superintendent.  He directed Slack to disconnect the water needed and was told that it would be done.  Defendants admit this. Defendants were at all times aware of this and intentionally withheld this information from the Grand Jury in order to arrest and charge Plaintiff.

      f.     "The grand jury also learned that, despite his *purportedly* concerned emails to Slack in January of 2019, Brazil took no action to remove, disconnect or remediate lead contaminated water sources, or to ascertain whether the work had been done." This statement is intentionally misleading and intentionally omits exculpatory facts relevant to Plaintiff.  Plaintiff was on medical leave in January 2019, with a severe concussion, lacerations and contusions over his entire body.  He dutifully alerted Joseph Slack and the superintendent.  He directed Slack to disconnect the water needed and was told that it would be done.  Defendants were at all times aware that Plaintiff, as the Director of Operations, necessarily relied on the manpower of other maintenance workers to disconnect water sources, and to keep them disconnected.

      g.     "Plaintiff failed to warn students of lead in water." This is a lie.  Joseph Slack placed signs at affected water fountains.

h.      Plaintiff had a duty to warn of high lead levels AFTER HIS RESIGNATION.  This is a lie.

i.      Plaintiff possessed the scientific knowledge and training to fully appreciate Guzek test results.  This is a lie.

j.      The alleged failure to comply with the Federal Asbestos Hazard Emergency Response Act (AHERA) supports criminal charges and arrest.  This is a lie.

k.      Plaintiff was aware of dangerous asbestos exposure to children.  This is a lie.  Plaintiff was never presented with a report indicating dangerous air quality or with a recommendation that a school building be closed due to the presence of asbestos.

l.      A principal contacted Plaintiff with photos of collapsed ceiling containing dangerous levels of asbestos and Plaintiff did nothing in response.  This is a lie. The subject ceiling was tested and it contained no asbestos.

m.      The "fact" that the new administration, Dougherty and McTieranan "took immediate steps" in January of 2020 to remediate asbestos and lead is evidence that Plaintiff was guilty of child endangerment.  This is a lie.  As demonstrated by the Finan email, and many others in Defendants' possession, Dougherty and McTieranan deliberately sent all school children back to the same buildings that were allegedly "hazardous" in August of 2019.

n.      The alleged failure to comply with 24 P.S. § 7-742 ("Lead Testing Code") supports criminal charges and arrest.  This is a lie.

o.      That plaintiff "*ignored repeated reports* of widespread environmental hazards".  See Criminal Complaint.  This is a lie.  In fact, Defendants contradict this very statement in the grand jury presentment when they admit that Plaintiff commanded Joseph Slack take water sources out of service and forwarded test results to Slack and Kierjan.  Plaintiff's actions cannot reasonably be characterized as "ignoring" test results.

p.      That Plaintiff failed to address "known toxic asbestos."  See Criminal Complaint.  This is a lie.  All *air quality reports*, including those in 2019, revealed NO THREAT to students or staff.  Defendants at all times knew this.

72.     As a result of Defendants' intentional misrepresentations, Plaintiff was arrested on September 30, 2020.

73.     Prior to his arrest, Defendants contacted local media and scheduled a press conference for attorney general, Josh Shapiro, to discuss the charges against Plaintiff.  Plaintiff was directed to turn himself in at the same time as the scheduled press conference.

74.     Plaintiff was handcuffed, and his legs were placed in shackles.  He was chained to a bench in the State Police barracks.  Defendants previously alerted the media resulting in news cameras surrounding the barracks.

75.     Plaintiff's arrest was clearly orchestrated by then attorney general, Joshua's Shapiro's office, as a "dog and pony" show designed for maximum publicity as evidence by the press conference scheduled in advance for the same day.

76.     At the press conference, Shapiro, by and through the efforts of Defendants, made wildly bombastic and slanderous remarks about Plaintiff designed to generate "buzz" and positive publicity.  This is all the attorney general's office wanted – they destroyed a man's life for political gain.

77.     Assistant Attorney General Eric Olson thereafter dismissed all charges against Plaintiff because prosecuting Plaintiff was "unethical" based upon the evidence.  Olsen stated in writing that he would dismiss the charges against Plaintiff without consideration of any kind and that plaintiff "doesn't even have to agree not to sue [him]."

78.     Contrary to Defendants' false statements to the press thereafter, Plaintiff never cooperated with Defendants in exchange for dismissal of his charges.

79.     Similarly, Defendant Mulvey expressly apologized to Plaintiff for the entire charade when the charges were dismissed on the account of Plaintiff's innocence.


**COUNT I**
**PLAINTIFF V. ALL DEFENDANTS**
**MALICIOUS PROSECUTION under 42 U.S.C. 1983 the 4th Amendment of the United States Constitution**

80.     Plaintiff incorporates by reference herein as though recited verbatim at length the

allegations of the preceding paragraphs.

81.     Defendants, acting under color of state law, instituted and/or procured criminal proceedings against Plaintiff without probable cause and with malice, in violation of Plaintiff's constitutional rights.

82.     The criminal proceedings were terminated in Plaintiff's favor.

83.     Defendants made false statements and omissions that they knew were false or would have known were false but for ***reckless disregard for the truth***.

84.     Defendants based criminal charges upon the alleged failure to adhere non-punitive administrative statutes.

85.     Defendants made unilateral decisions about the materiality of information and chose to ignore evidence that directly exculpated Plaintiff.

86.     Defendants made assertions, both in the Criminal Complaint and during grand jury proceedings, demonstrating their willingness to affirmatively distort the truth, perhaps none more glaring than the ridiculous statement that Plaintiff "***ignored*** test results."

87.     As a direct and proximate result of the actions of Defendants, Plaintiff was falsely held against his will, expended monies including attorneys' fees in defense of the criminal charges against him, suffered irreparable harm to his reputation and was terminated from his job.

88.     Plaintiff was also deprived of his liberty.

89.     The above actions of the defendants were because of the policies, practices and/or customs of the Scranton School Board, which acted by and through Defendants Dougherty and McTieranan.

90.     The actions of Defendant aforesaid constitute malicious prosecution, in violation

of Plaintiffs' Fourth, Fifth and Fourteenth Amendment rights.

WHEREFORE, Plaintiff respectfully requests this Honorable Court:

a.  Enter a declaratory judgment that Defendant's acts complained of herein have violated and continue to violate the rights of Plaintiff.

b.  Award Plaintiff compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

c.  Award reasonable costs and attorneys' fees;

d.  Award punitive damages; and

e.  Grant any other relief this Court deems just and proper under the circumstances.

## COUNT II
## PLAINTIFF V. ALL DEFENDANTS
## MALICIOUS USE AND ABUSE OF PROCESS under 42 U.S.C. 1983

91.  Plaintiff incorporates by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

92.  As set forth above, the Defendants' application of the legal process was so lacking in justification as to lose its legitimate function as a reasonably justifiable litigation procedure.

93.  There could be no *legitimate* objective served by criminally prosecuting a school administrator [Plaintiff] for child endangerment while knowing, in fact admitting, that 1) no child was harmed 2) Plaintiff proactively performed environmental testing and 3) Plaintiff disseminated test results to his supervisor and subordinates and commanded maintenance staff to

take remedial action.

94.     Defendants created a false narrative and put on the above charade solely to generate a desired media story and, in Dougherty/McTiernan's case, solely to shift blame to Plaintiff and away from themselves and the School Board.

95.     As a direct and proximate result of the actions of Defendants, Plaintiff was Confined against his will, expended monies including attorneys' fees in defense of the criminal charges against him, suffered irreparable harm to his reputation and was prohibited from operating his business.

96.     Plaintiff was also deprived of his liberty.

97.     The above actions of the defendants were as a result of the policies, practices and/or customs of the Scranton School Board.

98.     The actions of Defendant aforesaid constitute malicious use and abuse of process, in violation of Plaintiffs' Fourth, Fifth and Fourteenth Amendment rights.

WHEREFORE, Plaintiff respectfully requests this Honorable Court:

a.      Enter a declaratory judgment that Defendant's acts complained of herein have violated and continue to violate the rights of Plaintiff.

b.      Award Plaintiff compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

c.      Award reasonable costs and attorneys' fees;

d.      Award punitive damages; and

    e.      Grant any other relief this Court deems just and proper under the circumstances.

## COUNT III
## PLAINTIFF V. All DEFENDANTS
## FALSE ARREST under 42 U.S.C. 1983

99.    Plaintiff incorporates by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

100.    Plaintiff was arrested by defendants without probable cause.

101.    As a direct and proximate result of the actions of Defendants, Plaintiff was Confined against his will, expended monies including attorneys' fees in defense of the criminal charges against him suffered irreparable harm to his reputation and was prohibited from operating his business.

102.    Plaintiff was also deprived of his liberty.

103.    The above actions of the defendants were as a result of the policies, practices and/or customs of the Scranton School Board.

104.    The actions of Defendant aforesaid constitute false arrest, in violation of Plaintiffs' Fourth, Fifth and Fourteenth Amendment rights.

WHEREFORE, Plaintiff respectfully requests this Honorable Court:

    a.      Enter a declaratory judgment that Defendant's acts complained of herein have violated and continue to violate the rights of Plaintiff.

    b.      Award Plaintiff compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay,

loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

c.      Award reasonable costs and attorneys' fees;

d.      Award punitive damages; and

e.      Grant any other relief this Court deems just and proper under the circumstances.

## COUNT IV
## PLAINTIFF V. DEFENDANS
## FALSE IMPRISONMENT under 42 U.S.C. 1983

105.    Plaintiff incorporates by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

106.    Plaintiff was imprisoned by defendants without probable cause for said imprisonment.

107.    As a direct and proximate result of the actions of Defendants, Plaintiff was incarcerated, expended monies including attorneys' fees in defense of the criminal charges against him and was terminated from his employment.

108.    Plaintiff was also deprived of his liberty.

109.    The above actions of the defendants were as a result of the policies, practices and/or customs of the Scranton Board.

110.    The actions of Defendant aforesaid constitute false imprisonment, in violation of Plaintiffs' Fourth, Fifth and Fourteenth Amendment rights.

WHEREFORE, Plaintiff respectfully requests this Honorable Court:

a.   Enter a declaratory judgment that Defendant's acts complained of herein have violated and continue to violate the rights of Plaintiff.

b.   Award Plaintiff compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

c.   Award reasonable costs and attorneys' fees;

d.   Award punitive damages; and

e.   Grant any other relief this Court deems just and proper under the circumstances.

## COUNT V
## PLAINTIFF V. ALL DEFENDANTS
## CONSPIRACY TO VIOLATE CIVIL RIGHTS, 42 USC 1983

111.   Plaintiff incorporates by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

112.   Defendants Mulvey and McHugh with Dougherty and McTiernan's help, created out of whole cloth a false dichotomy between the Plaintiff/Kirijan's administration and the Dougherty/McTiernan administration to support the baseless argument that the latter administration's remediation efforts proved the former's criminal failure.

113.   In order to facilitate this false dichotomy, Dougherty/McTiernan lied and alleged that they had no knowledge whatsoever of asbestos or lead in the SSD.

114.   In turn, Defendants Mulvey and McHugh focused criminal charges against only Plaintiff/Kirijan's administration despite the fact that Dougherty/McTiernan sent students into the same allegedly hazardous schools in August of 2019.

115.    The above actions of the defendants were as a result of the policies, practices and/or customs, and at the direction of, the Scranton School Board.

116.    The actions of Defendant aforesaid constitute false imprisonment, in violation of Plaintiffs' Fourth, Fifth and Fourteenth Amendment rights.

WHEREFORE, Plaintiff respectfully requests this Honorable Court:

   a.    Enter a declaratory judgment that Defendant's acts complained of herein have violated and continue to violate the rights of Plaintiff.

   b.    Award Plaintiff compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

   c.    Award reasonable costs and attorneys' fees;

   d.    Award punitive damages; and

   e.    Grant any other relief this Court deems just and proper under the circumstances.

## COUNT VI
## PLAINTIFF V. DOUGHERTY/MCTIERNAN/SCHOOL BOARD
## COMMON LAW MALICIOUS PROSECUTION

117.    Plaintiff incorporates by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

118.    Defendants initiated and procured the institution of criminal proceedings against Plaintiff without probable cause primarily to shift blame to Plaintiff and away from themselves.

119.    By making a charge before a public official or body in such form as to require the

official or body to determine whether process shall or shall not be issued against Plaintiff,

Defendants initiated or procured the institution of criminal proceedings.

120.    The information that the School Board by and through Dougherty/Mctiernan fed

to Defendant investigators, including that the Dougherty/Mctiernan administration had no

knowledge of asbestos or lead, was knowingly false and resulted in Plaintiff's arrest and

prosecution.

121.    The criminal proceedings terminated in Plaintiff's favor.

122.    As a direct and proximate result of the actions of Defendant, Plaintiff was

falsely held against his will, was charged and prosecuted and expended monies including

attorneys' fees in defense of the criminal charges against him, suffered irreparable harm to his

reputation and was prohibited from operating his business.

123.    Plaintiff was also deprived of his liberty.

124.    The above actions of the defendants were as a result of the policies, practices

and/or customs of the Scranton School Board.

125.    The actions of Defendant aforesaid constitute malicious prosecution, in violation

of Plaintiffs' Fourth, Fifth and Fourteenth Amendment rights, as well as common law.

WHEREFORE, Plaintiff respectfully requests this Honorable Court:

a.    Enter a declaratory judgment that Defendant's acts complained of herein
have violated and continue to violate the rights of Plaintiff.

b.    Award Plaintiff compensatory damages including but not limited to: pain,
suffering, past economic loss, future economic loss, back pay, front pay,
loss of life's pleasures, loss of reputation, benefits, emotional distress and
other damages;

c.      Award reasonable costs and attorneys' fees;

d.      Award punitive damages; and

e.      Grant any other relief this Court deems just and proper under the circumstances.

## COUNT VII
## PLAINTIFF V. DOUGHERTY/MCTIERNAN
## COMMON LAW MALICIOUS USE AND ABUSE OF PROCESS

126.    Plaintiff incorporates by reference herein as though recited verbatim at length the allegations of the preceding paragraphs.

127.    By making a charge before a public official or body in such form as to require the official or body to determine whether process shall or shall not be issued against Plaintiff, Defendants initiated or procured the institution of criminal proceedings.

128.    Defendants did so without probable cause and primarily for a purpose other than that of bringing Plaintiff to justice.

129.    The proceedings have terminated in Plaintiff's favor.

130.    As a direct and proximate result of Defendants actions, Plaintiff was Confined against his will, expended monies including attorneys' fees in defense of the criminal charges against him, suffered irreparable harm to his reputation and was prohibited from operating his business.

131.    Plaintiff was also deprived of his liberty.

WHEREFORE, Plaintiff respectfully requests this Honorable Court:

a.      Enter a declaratory judgment that Defendant's acts complained of herein have violated and continue to violate the rights of Plaintiff.

26

b.    Award Plaintiff compensatory damages including but not limited to: pain, suffering, past economic loss, future economic loss, back pay, front pay, loss of life's pleasures, loss of reputation, benefits, emotional distress and other damages;

c.    Award reasonable costs and attorneys' fees;

d.    Award punitive damages; and

e.    Grant any other relief this Court deems just and proper under the circumstances.

## <u>JURY TRIAL DEMAND</u>

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

*/s/Joseph P. Guzzardo, Esq.*
Joseph P. Guzzardo, Esq.
Counsel for Plaintiff
Guzzardo & Associates LLC
121 S. Broad St. Suite 1600
Philadelphia, PA
jguzzardo@guzzardolaw.com
215-718-6691

# EXHIBIT "A"



Jun 9, 2016, 12:36 PM

RESULTS

owing table summarizes the lead results from the William Prescott Elementary School.

| Description | Lead Concentration (mg/l) | Lead Action Level (mg/l) |
|---|---|---|
| 2nd Floor, Room 218 – Water Fountain | 0.082 | 0.015 |
| 2nd Floor, Teachers Lounge - Sink | 0.002 | 0.015 |
| 2nd Floor, Hallway – Water Fountain | <0.001 | 0.015 |
| 2nd Floor, Hallway – Water Fountain | 0.021 | 0.015 |
| 2nd Floor, Room 204 – Water Fountain | 0.084 | 0.015 |
| 2nd Floor, Room 205 – Water Fountain | 0.004 | 0.015 |
| 1st Floor, Room 104 – Water Fountain | 0.004 | 0.015 |
| 1st Floor, Hallway – Tall Water Fountain | <0.001 | 0.015 |
| 1st Floor, Hallway – Short Water Fountain | <0.001 | 0.015 |
| 1st Floor, Room 101 – Water Fountain | 0.006 | 0.01 |
| 1st Floor, Room 101 – Water Fountain | 0.004 | 0.01 |
| Basement, Computer Room Office – Sink | 0.372 | 0.01 |
| Basement, Hallway – Water Fountain | 0.007 | 0.0 |
| Basement, Health Room – Sink | 0.009 | 0.0 |
| _____ Bathrooms – Sink | | |

Aug 14, 2016, 11:33 AM

Crew working on wall today